# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

**BLAND EDWARD MOUNCIL**                **CIV. ACTION NO. 5:20-01332 SEC P**

**VERSUS**                              **JUDGE JERRY EDWARDS, JR.**

**JUSTIN DUNN, ET AL.**                 **MAG. JUDGE KAYLA D. MCCLUSKY**

## REPORT AND RECOMMENDATION

Before the undersigned magistrate judge, on reference from the District Court, is a motion for summary judgment [doc. # 53] filed by Defendants, Justin Dunn and Ryan Chapman. The motion is opposed.   For reasons set forth below, IT IS RECOMMENDED that the motion for summary judgment be GRANTED.

### Background

On or about October 13, 2020, Plaintiff Bland Edward Mouncil ("Mouncil") filed the instant, pro se civil rights complaint under 42 U.S.C. § 1983 to recover damages he sustained from excessive use of force employed by law enforcement officers to effect his October 21, 2019 arrest.   *See* Compl. & Amend. Compl. [doc. #s 1, 6].

In his complaint, as amended, Mouncil alleged that, following a high-speed chase, he exited his vehicle, kneeled, and placed both hands above his head.   *Id*.   Caddo Parish Sheriff's Deputy Justin Dunn ("Dunn" or "Deputy Dunn") exited his police unit with a K-9 named "Samos" that he held onto with one hand, while pointing a gun with his other.   *Id*.   Mouncil contends that he immediately complied with Dunn's instructions to lay on the ground with his "arms stretched out and hands visible with no weapons or keys."   *Id*.   Caddo Parish Sheriff's Deputy Ryan Chapman ("Chapman" or "Deputy Chapman") kneeled next to Mouncil and placed Mouncil's arm on his lower back.   *Id*.   Mouncil's left arm purportedly remained stretched "out

on the ground." *Id*.  Deputy Chapman exclaimed, "[s]top resisting"!  *Id*.   Mouncil protested

that he was not resisting.  *Id*.

    According to Mouncil, within seconds, Deputy Dunn instructed his K-9, Samos, to attack

him because Dunn claimed that Mouncil was attempting to flee or to retrieve a weapon.  *Id*.

Mouncil maintains that he did not attempt to flee or to retrieve a weapon; rather, he complied

with all orders, he did not resist, he was not a threat, and he was unarmed, motionless, and

defenseless.  *Id*.  He "made no attempt to give these deputies any reason to use force on [him]."

*Id*.

    Nevertheless, Samos proceeded to attack Mouncil from the crown of his head to the base

of his neck, which caused Mouncil to scream and fear for his life, "snatching [his] hand away to

protect [his] head area."  *Id*.   He heard Dunn and Chapman yell, "stop resisting."   *Id*.   Samos

attacked Mouncil's left bicep area, which prompted Mouncil to keep "screaming that [he was]

not resisting and to get the dog off [him]."  *Id*.   Mouncil was still lying on the ground "while [ ]

Samos was biting and tugging [his] left arm bicep area, and [his] right arm was being held by

Deputy Ryan Chapman."  *Id*.

    After the officers took Mouncil into custody, they charged Mouncil with careless

operation, aggravated flight from an officer, resisting an officer with force or violence, and a

drug crime.  *Id*.[1]

    As a result of Samos's attack, Mouncil suffered injuries to his left bicep and shoulder,

and continues to experience restricted motion in his shoulder, discomfort, and constant pain

---

[1] Mouncil presently is serving a 120-month sentence after having pled guilty to the federal
charge of conspiracy to possess with intent to distribute methamphetamine.  *See United States v.
Mouncil*,  Criminal Action No. 5:19-0394-5 [doc. #429] (W.D. La.).  The written factual basis
for his guilty plea recounts the events that occurred leading up to his arrest by officers on
October 21, 2019.  [doc. #231-1].

2

when he sleeps. *Id*. Mouncil suffers from a "frozen shoulder" and contends that he is permanently disabled because his left shoulder "will never be the same." *Id*. He seeks a total of $2,100,000.00 for his injuries, mental anguish, pain, suffering, and past, present, and future rehabilitation. *Id*.

Mouncil initially sued Samos, plus Deputies Dunn and Chapman. However, in a December 20, 2020 Report and Recommendation ("R&R"), former Magistrate Judge Karen Hayes recommended that Mouncil's claims against Samos be dismissed because, as a dog, Samos is not a "person" subject to liability under § 1983. (R&R [doc. # 7]). She further recommended that Mouncil's claims against Dunn and Chapman be stayed during the pendency of Mouncil's related criminal proceedings. (R&R [doc. # 7]). On July 30, 2021, Judge Foote adopted the R&R and entered a corresponding judgment. (Judgment [doc. # 11]).

On April 21, 2022, Judge Foote granted a motion to lift the stay filed by Mouncil, so he could proceed with his claims against Deputies Dunn and Chapman. [doc. #14].

On April 25, 2022, the undersigned ordered service upon the remaining Defendants and set deadlines in the matter. *See* Mem. Order [doc. # 15]. Service was delayed, however, because of Mouncil's failure to update his address and because of his need to pre-pay the costs of service. *See* doc. #s 16-25. However, the Court later granted Mouncil's application to proceed *in forma pauperis*. *See* doc. #s 25 & 27.

Chapman and Dunn did not file a responsive pleading in the matter until February 27, 2023. (Answer [doc. # 26]). Furthermore, the parties failed to comply with the Court's scheduling deadlines, which prompted a show cause order, and several extensions of the discovery and dispositive motions deadlines. *See* doc. #s 31-37, 42-44, 49-50.

Meanwhile, on February 5, 2024, Mouncil filed a motion to compel discovery, which the undersigned granted in part and denied in part. *See* doc. #s 38, 40, & 42. On March 20, 2024,

3

Mouncil appealed the order, which remains pending before the District Court.   *See* doc. #s 45-47.

On March 28, 2024, Mouncil filed a document entitled, "Plaintiff's Statement of Material Facts and Conclusions of Law in Opposition to Defendants Motions for Summary Judgment and Dismissal Pursuant to Fed. R. Civ. P. 56(a)" ("Statement").   [doc. # 48].   Mouncil's Statement reads like an amended complaint, and the Clerk of Court docketed a jury demand that Mouncil had requested therein.   *Id.*   However, the Clerk did not docket the additional Defendants that Mouncil referenced in his Statement, including, Caddo Parish Sheriff Steve Prator, Caddo Parish Sheriff's Deputy Earl J. Parker, and City of Greenwood Police Officer Fertenbal.   *Id.*   Mouncil also purported to assert various claims under state law.   *Id.*

Finally, as relevant here, Defendants Dunn and Chapman filed the instant motion for summary judgment on July 24, 2024, invoking qualified immunity and seeking dismissal of Mouncil's claims against them.

On September 20, 2024, Mouncil filed his memorandum in opposition to the motion for summary judgment.   (Pl. Opp. Memo. [doc. # 58]).

Dunn and Chapman did not file a reply brief, and the time to do so has passed.   *See* Notice of Motion Setting [doc. # 55]).   Accordingly, the matter is ripe.

## **<u>Summary Judgment Standard</u>**

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.   *Id.*

4

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.*

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. While courts will "resolve factual controversies in favor of the non-moving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). There can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-323. The non-moving party may not rely merely on the allegations and conclusions contained within the pleadings; rather, the non-movant "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). The non-movant does not satisfy his burden merely by demonstrating some metaphysical doubt as to the material facts, by setting forth conclusory allegations and unsubstantiated assertions, or by presenting but a scintilla of evidence. *Little*, 37 F.3d at 1075

5

(citations omitted).

Moreover, "summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *Little,* 37 F.3d at 1075-1076 (citation omitted).   In sum, "[a]fter the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000) (citation omitted).

However, when, as here, a public official makes a good faith assertion of qualified immunity, the ordinary summary judgment burden of proof is shifted to the plaintiff to show that the defense is unavailable. *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (citation omitted).   Under these circumstances, "the public official need not show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law." *Id*.

Furthermore, when video evidence is available, the court is required to "view the facts in the light depicted by the videotape." *Boyd v. McNamara*, 74 F.4th 662, 665-666 (5th Cir. 2023), *cert. denied sub nom. Johnson v. Boyd*, ___ U.S. ___, 144 S.Ct. 562 (2024) (citing *Salazar v. Molina*, 37 F.4th 278, 280 (5th Cir. 2022) and *Scott v. Harris*, 550 U.S. 372, 381 (2007)).   Thus, the court will "assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Bailey v. Ramos*, ___ F.4th ____, 2025 WL 66320, at *3 (5th Cir. Jan. 10, 2025) (citation omitted).   However, to the extent that the video evidence is inconclusive, the ordinary summary judgment standard applies. *Boyd*, 74 F.4th at 665-666 (citing *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021)).

### **Evidence Presented**

In support of their motion for summary judgment, Dunn and Chapman submitted three

videos that captured their October 21, 2019 encounter with Mouncil:    (1) Dunn's dashcam (Exh. A [doc. # 53-4]); (2) Dunn's bodycam (Exh. B [doc. # 53-4]); and (3) Chapman's bodycam (Exh. C [doc. # 53-4]).    *See* Sworn Statement of Captain Shron Johnson; MSJ, Exh. 1 [doc. # 53-3] (authenticating the videos).[2]    Dunn and Chapman also submitted copies of their incident reports, plus another report completed by Deputy Earlton Parker.    (Incident Reports; MSJ, Exh. D [doc. # 54-6]).[3]

The evidence establishes that, on October 21, 2019, at approximately 2250 hours, while on duty, Dunn conducted a traffic stop of a 2018 red Toyota Tacoma that was eastbound on Interstate 20, near Highway 169.    (Caddo Parish Sheriff's Office Supplemental Report; Def. MSJ, Exh. D).    The Tacoma came to a stop on the shoulder of the interstate.    *Id*.; Dunn bodycam, 2:55; MSJ Exh. B.    Deputy Dunn exited his police unit and asked the (as yet unidentified) driver of the Tacoma to step out of the vehicle and to walk back towards him. (Dunn bodycam, 2:58; MSJ Exh. B).    Instead, the driver (later determined to be Mouncil) drove away and proceeded to lead Dunn and other law enforcement officers on an eleven-plus minute, high speed chase, that, at least initially, included weaving through traffic and driving on the shoulder.    (Dunn dashcam, 3:45-15:13; MSJ Exh. A).

According to Deputy Chapman, he and Dunn pursued the Tacoma on Interstate 20 at speeds exceeding 90 miles per hour.    (Caddo Parish Sheriff's Office Supplemental Report; Def. MSJ, Exh. D; Dunn's bodycam, 4:00; MSJ, Exh. B).    When Mouncil exited Interstate 20, he ignored several stop signs and eventually resumed speeds that reached over 80 miles per hour. (Caddo Parish Sheriff's Office Supplemental Report; Def. MSJ, Exh. D; Dunn dashcam, 3:45-

---

[2] There is no indication that Mouncil disputes the authenticity or accuracy of the videos.

[3] Deputy Chapman authenticated the reports.    (Sworn Statement of R. Chapman; MSJ, Exh. 2 [doc. # 54-5]).

15:13; MSJ Exh. A).

During the chase, Dunn and Chapman observed Mouncil throw drugs from the vehicle. (Dunn bodycam, 5:37; MSJ, Exh. B).    City of Greenwood Police Officer Fertanbaugh stopped and recovered the package.    (Caddo Parish Sheriff's Office Supplemental Report; Def. MSJ, Exh. D; Dunn's bodycam, 5:43; MSJ, Exh. B).    Dunn referred to the package as "dope," over the radio.    *Id.*    He also stated that they were going to have felony narcotics charges against the driver because he had thrown a ton of dope out.    *Id.* at 10:59.    Dunn cautioned other officers, via the radio, that, "if this thing ends in a foot bail, y'all hold up, we'll send Samos."    *Id.* at 11:37.    Two officers acknowledged the warning over the radio.    *Id.*    A third officer stated, "132 to *K-9 justice*."    *Id.* at 11:48.    A short while later, another unknown officer stated over the radio that they had about a "kilo of meth, here . . . we recovered."    *Id.* at 11:57.

Although Mouncil exited to the south of Interstate 20, and then proceeded in an eastbound direction, he eventually doubled back, crossed to the north of Interstate 20 and headed west on Highway 80 towards the intersection with Interstate 20 at Exit 5.    (Caddo Parish Sheriff's Office Supplemental Report; Def. MSJ, Exh. D; Dunn dashcam, 3:45-15:13; MSJ Exh. A).    Before the intersection, however, the video shows that the road ahead was blocked by police cruisers with flashing lights.    (Dunn dashcam, 15:09; MSJ Exh. A).

Likely realizing that the jig was up, Mouncil pulled into a Sinclair Gas Station and stopped the pickup truck.    *Id.*, at 15:14.    He immediately exited the truck with his open hands in the air.    *Id.*    He then promptly lay prone on the ground with his hands spread out before him. *Id.* at 15:16.

Deputy Dunn pulled into the station behind Mouncil and ordered him to get on the

ground.[4]    (Dunn bodycam, 14:48; MSJ, Exh. B).   Dunn ordered Mouncil to "stay there," and then opened the rear door of his unit to let Samos out.   *Id*., 14:50.   Another police unit arrived, which added to the loud cacophony of police sirens reverberating off the gas station.   *Id*.   With his left hand on Samos's collar, and a gun in his right hand pointed at the still prone Mouncil, Dunn approached Mouncil, while issuing commands to Samos in an unknown language.   *Id*. at 14:58.   Dunn yelled to Mouncil, "you stay right there"!   *Id*. at 15:00.

Mouncil remained prone on the ground, next to the pickup with his hands clasped behind his head.   *Id*.   When Dunn commanded Mouncil to put his hands out, Mouncil complied immediately.   *Id*., at 15:02-15:04.   Samos began to bark at Mouncil.   *Id*.   Dunn yelled, "you think you were going to outrun me"!?   *Id*., at 15:09.   Mouncil pointed to his ear and tried to explain that he could not hear Dunn.   *Id*.   Dunn, replied, "I know; shut up; stop moving"!   *Id*., at 15:13.   Mouncil immediately spread his arms and open hands out in front of him.   *Id*., at 15:14.   At least three more officers, one of whom was Deputy Chapman, also were present and pointing their weapons at Mouncil.   *Id*.

Dunn told the officers to "go," whereupon an officer holstered his weapon and approached Mouncil.   *Id*. at 15:16.   The officer grabbed Mouncil's right arm and bent it high behind his back.   *Id*., at 15:19.   Deputy Chapman entered the scene and tried to pull Mouncil's left arm behind his back.   *Id*., at 15:21.   Meanwhile, another officer remained standing, overlooking the scene, with his weapon pointed in Mouncil's general direction.   *Id*.

Chapman and the other officer, possibly, Fertanbaugh, managed to get both of Mouncil's arms behind his back.   *Id*., at 15:22.   However, Mouncil either moved his left arm or it slipped out of Chapman's grasp, and he placed his open palm on the ground.   *Id*. at 15:23.

---

[4]   Mouncil already was prone on the ground with his hands on his head.   *Id*.

As Chapman tried to regain hold of Mouncil's arm, Dunn believed, in that split second, that Mouncil was trying to push up and flee or trying to go for a weapon.   (Caddo Parish Sheriff's Office Supplemental Report; Def. MSJ, Exh. D).   Accordingly, he told K-9 Samos to bite Mouncil and attempted to direct Samos to Mouncil's left arm.   *Id*.   Samos, however, bit Mouncil on the back of the head.   *Id*.

Samos's bite to Mouncil's head and neck area lasted about six seconds.   (Dunn bodycam, 15:31; MSJ, Exh. B).   During this time, Mouncil remained on the ground and tried to use his left arm to protect his head or neck.   *Id*.   Dunn documented that he removed Samos from the bite quickly because of the location of the bite.   (Caddo Parish Sheriff's Office Supplemental Report; Def. MSJ, Exh. D).

Dunn again ordered Mouncil to put his hands behind his back.   (Dunn bodycam, 15:33; MSJ, Exh. B).   Before Mouncil could comply, however, Deputy Chapman and Officer Fertanbahl began yanking each of Mouncil's arms in physiologically incompatible directions. *Id*. at 15:34.

According to Dunn, Mouncil again pulled his hand free and placed it on the ground as if he were trying to escape or attempting to retrieve a weapon.   (Caddo Parish Sheriff's Office Supplemental Report; Def. MSJ, Exh. D).   Consequently, Dunn again instructed Samos to bite Mouncil, which he directed towards Mouncil's left arm.   *Id*.

Upon reviewing the video, it is not clear that Mouncil withdrew his arm from Chapman's grasp before Dunn directed Samos towards Mouncil.   (Dunn bodycam, 15:35; MSJ, Exh. B). Another reasonable interpretation of the video evidence is that Samos began moving towards Mouncil first, which then prompted Mouncil to move his left arm in an effort to protect himself from the approaching dog.   *Id*.

Samos began biting Mouncil's upper left arm or shoulder at the 15:36 mark of Dunn's

bodycam, which prompted Mouncil to cry out in pain.   *Id*. at 15:38.   After about three seconds, Mouncil rolled onto his back, and cried out in pain.   *Id*. at 15:40.   Meanwhile, Dunn yelled at Mouncil to "stop fighting the dog"!   *Id*.[5]   A few seconds later, Dunn again yelled, "stop fighting," as Mouncil continued to lie on his back screaming in agony from the ongoing dog bite. *Id*., at 15:44.   Chapman and two other officers stood by, at the ready, while Dunn, via Samos, continued to administer the bite.   (Chapman bodycam, 14:17; MSJ, Exh. C).   Chapman told the other two officer to "hold on" and not to "tase" the dog.   *Id*.

After approximately eleven seconds of Mouncil writhing on the ground with a K-9 clamped down on his arm, Dunn directed the other officers to "pat him down; make sure he doesn't have any guns."   (Dunn bodycam, 15:47; MSJ, Exh. B).

Although Mouncil is lying on his back with Samos latched onto his arm, Dunn implored Mouncil to "stop fighting," and a few seconds later he reiterated, "stop fighting the dog."   *Id*. at 15:52-56.   During this period, Chapman searched the pockets of Mouncil's shorts.   *Id*.   At 15:58, Chapman appears to have finished searching Mouncil.   *Id*.   He did not find any weapons. *Id*.   Mouncil then rolled over onto his stomach.   *Id*.

Chapman ordered Mouncil to put his hands behind his back.   *Id*. at 16:02.   Mouncil immediately complied, even though Samos still was attached to his left arm.   *Id*.   While Chapman tried to cuff Mouncil, Dunn maintained his grip on the still-engaged Samos.   *Id*., at 16:07.   Three other officers stood nearby, ready to assist.   *Id*.   At 16:10, Dunn began using a command in an apparent attempt to coax Samos into releasing his bite.   *Id*.   Ten seconds later, Samos complied.   *Id*., at 16:20.   Approximately eight seconds later, Chapman finished cuffing Mouncil's other arm.   *Id*. at 16:28.

_____

[5] The video does not depict Mouncil "fighting" the dog.   Rather, he was rolling on the ground in pain, while the K-9 continued to maul him.

Dunn returned Samos to his police unit.   Upon his return, a minute later, he directed Chapman to roll the still prone and handcuffed Mouncil onto his side.   *Id*. at 17:31.   As Chapman rolled him over, Mouncil cried out in pain, which prompted Chapman to yell, "[s]top screaming.   I don't care.   Don't run like a dumbass"!   *Id*., at 17:37-17:44; Chapman bodycam, 16:20; MSJ, Exh. C.   Dunn patted Chapman on the back and said, "easy bud, I got him." (Dunn bodycam, 17:47; MSJ, Exh. B).

A couple of minutes later, Dunn asked the now seated and handcuffed Mouncil, "where all'd you get dog bit, partner"?   *Id*. at 19:26.   He explained to Mouncil that "you realize man, you can't jerk your arms out from under people like that when they're trying to put you in handcuffs."   *Id*. at 19:39.   A few seconds later, Dunn added, "when they tried to put your hands behind your back, you jerked your hand loose, man."   *Id*. at 19:51.   Mouncil replied, "I know you're doing your job . . . "   *Id*.

After Dunn advised Mouncil of his *Miranda* rights, he asked him why he ran from him. *Id*., at 20:22.   Mouncil explained that, "I thought y'all were going to kill me."   *Id*. at 20:24. Mouncil added that he was just trying to get somewhere that was lighted, which was why he pulled into the gas station.   *Id*., at 20:50.

At the 22:26 mark, Dunn told someone in civilian clothes, likely an officer in plainclothes, that Mouncil "messed around and got dog bit . . ."   *Id*. at 22:26.   The unidentified person responded, "nice."   *Id*.   Dunn further explained that "they were trying to cuff him and, uh, he, uh, jerked his hand out from under him and started screaming, "hold on."   *Id*. at 22:37. Mouncil deadpanned, "we don't be holdin' on."   *Id*.

Meanwhile, Chapman was having a discussion with the still seated Mouncil.   (Chapman bodycam, 21:18; MSJ, Exh. C).   Mouncil asked Chapman why the K-9 bit him.   Chapman replied, incredulously, "why? . . . because you ran, man . . . you got all kinds of felony charges."

12

*Id*. at 21:24.   Chapman then explained to Mouncil that the dog bit him because "when we came up to arrest you . . . to put the handcuffs on you . . . you tried to pull your hand away from me." *Id*. at 21:38.

A paramedic arrived on scene and asked Chapman what happened to Mouncil.   *Id*., at 21:58.   Chapman joked, "a puppy dog licked him too hard."   *Id*., at 21:58.   The paramedic played along, "oh, the chihuahua got him?"   *Id*. at 21:59.

### Analysis

## I.    Individual Liability under § 1983

Section 1983 provides that any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ." *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citing 42 U.S.C. § 1983).   Section 1983, however, does not create any substantive rights; it simply provides a remedy for the rights designated therein.   *Id*.   "Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983."   *Id*.   (citation omitted).

To state a cognizable claim for relief under 42 U.S.C. § 1983, "a plaintiff must plead two—and only two—allegations . . . First, the plaintiff must allege that some person has deprived him of a federal right.   Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law."   *Arnold v. Williams*, 979 F.3d 262, 266-67 (5th Cir. 2020) (citation and internal quotation marks omitted).

In addition, when, as here, a plaintiff seeks money damages from government officials in their individual capacities under § 1983, the affirmative defense of qualified immunity is available to protect defendants "from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   The qualified immunity doctrine balances two often conflicting interests:   "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*.   As such, "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (citations and internal quotation marks omitted).   In effect, qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (citing *Malley v. Briggs,* 475 U.S. 335, 343, 341 (1986) (internal quotation marks omitted).

Qualified immunity is nominally characterized as an affirmative defense.   However, once raised by defendants, it devolves upon the plaintiff to negate the defense by showing that the official's conduct violated clearly established law. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citation omitted).   Plaintiff's burden is two-pronged. *Club Retro LLC v. Hilton*, 568 F.3d 181, 194 (5ᵗʰ Cir. 2009) (quoted sources omitted).   First, a plaintiff must demonstrate that defendant(s) violated a constitutional right under current law. *Id*.   "Second, [plaintiff] must claim that the defendant[s'] actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." *Id*.   (quoted source and internal quotation marks omitted).   The courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be

addressed first in light of the circumstances of the particular case at hand." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (citation omitted).

A law is clearly established when there exists "controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013) (quoted source omitted). Although a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question *beyond debate.*" *Id.* (citations and internal quotation marks omitted). "Because nonprecedential opinions do not establish any binding law for the circuit, they cannot be the source of clearly established law for qualified immunity analysis." *Salazar*, 37 F.4th at 286 (citations omitted). Furthermore, a case cannot clearly establish the law if the court finds no constitutional violation. *Id.* (citation omitted).

Nonetheless, there is the "rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Joseph*, 981 F.3d at 330 (citations and internal quotation marks omitted). In the end, the question becomes whether the right is "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Hogan*, 722 F.3d at 735 (citations and internal quotation marks omitted).

Ordinarily, "qualified immunity claims should be addressed separately for each individual defendant." *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 731 (5th Cir. 2018) (citation omitted); *see also Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir. 2007) (overruling district court's decision to consider officers' conduct collectively, merely because they acted in

15

unison).   In this case, Dunn and Chapman analyzed Mouncil's § 1983 claim against Dunn as an excessive force claim under the Fourth Amendment.   They analyzed Mouncil's § 1983 claim against Chapman as a failure to intervene/bystander liability claim.   Mouncil did not dispute this characterization of his claims against Dunn and Chapman; thus, the Court will follow suit.

## II.    Excessive Force Claim against Dunn

An excessive force claim in the context of an arrest is analyzed under the Fourth Amendment's "objective reasonableness standard."   *Escobar v. Montee*, 895 F.3d 387, 393 (5th Cir. 2018) (citation omitted).[6]   To prevail, plaintiff "must establish (1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."   *Benfer v. City of Baytown, Texas*, 120 F.4th 1272, 1281–82 (5th Cir. 2024) (quoting *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 287 (5th Cir. 2020)).   In this case, video confirms that Dunn's K-9 bit Mouncil more than once, and there is no dispute that Mouncil suffered significant injury as a result.   Therefore, only the second and third prongs are at issue in this motion, that is, Mouncil must show that Dunn's use of the dog was a "clearly excessive use of force that was clearly unreasonable."   *Benfer*, 120 F.4th at 1282 (internal quotation marks omitted).

"In excessive-force claims, the reasonableness of an officer's conduct depends on the facts and circumstances of each particular case . . ."   *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).   Such a determination is based "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."   *Benfer*, 120 F.4th at 1282 (quoting *Escobar*, 895 F.3d at 394).   Thus,

---

[6] Because it is an objective test, the court may not consider any contentions relating to either party's subjective mental state.   *Id*. at 393 n.9 (citation omitted).

"[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Bros. v. Zoss*, 837 F.3d 513, 518–19 (5th Cir. 2016) (citation omitted).

The Supreme Court has enumerated three factors to gauge the reasonableness of an officer's use of force:  "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight."  *Sligh v. City of Conroe, Texas*, 87 F.4th 290, 298 (5th Cir. 2023) (citing, *inter alia*, *Graham*, 490 U.S. at 396).

Applying the foregoing considerations here, the Court initially finds that by leading officers on a high-speed chase, part of which occurred on a busy interstate, and then driving through intersections without stopping, Mouncil committed a dangerous and serious crime that weighs against a finding of excessive force.  *See Salazar*, 37 F.4th at 281–82 (dangerous car chase through residential area); *Cooper*, 844 F.3d at 522 (driving under the influence).  Adding to the element of danger, during the chase, Mouncil threw out a large amount of drugs.[7]

The Court recognizes that Mouncil eventually gave himself up, lay prostrate on the ground, with his hands out, and appeared responsive to commands.  Be that as it may, "the relevant inquiry is whether—despite the *appearance* of unambiguous surrender—an officer [would] have reason to doubt the suspect's compliance and still perceive a threat."  *Salazar*, 37 F.4th at 283 (quoting *Escobar*, 895 F.3d at 395) (internal quotation marks omitted).  Moreover,

---

[7] Mouncil conceded as part of the basis for his guilty plea that the drugs were later determined to be 2 bags containing 926.2 and 97.8 gross grams of methamphetamine. *United States v. Mouncil*, Criminal Action No. 5:19-00394-5 [doc. #231-1] (W.D. La.).

the Fifth Circuit has "repeatedly refused to hold that *any* application of force to a compliant

arrestee is *per se* unreasonable." *Salazar,* 37 F.4th at 282 (citation and internal quotation marks

omitted).  Therefore,

> a suspect cannot refuse to surrender and instead lead police on a dangerous hot
> pursuit—and then turn around, appear to surrender, and receive the same Fourth
> Amendment protection from intermediate force [i.e., a broad category of non-
> deadly force, such as police dogs and tasers, that] he would have received had he
> promptly surrendered in the first place.

*Salazar*, 37 F.4th at 282–83.

Here, Deputy Dunn stated that he thought that when Mouncil moved his hand from

Deputy Chapman's grasp, Mouncil was trying to push up and flee or alternatively attempting to

retrieve a weapon.  While Mouncil was illuminated by the well-lighted gas station and wearing

shorts with no socks, a reasonable officer could fear that he had a weapon secreted in a pocket,

even if the officers did not observe one.  Furthermore, Deputy Dunn, and the other officers

knew that Mouncil was involved in the drug trade.  *See* discussion *supra* (officers observed

Mouncil disposing of drugs during the chase).  The Fifth Circuit has emphasized that, "fear for

officer safety may be reasonable during drug arrests, even in the absence of any particularized

knowledge of the presence of weapons, because in drug deals . . . it is not uncommon for

traffickers to carry weapons."  *United States v. Maldonado*, 472 F.3d 388, 394 (5th Cir. 2006)

(*abrogated on other grounds by Kentucky v. King,* 563 U.S. 452 (2011) (internal citation and

quotation marks omitted).

On the other hand, the Fifth Circuit has noted that just because a suspect is unsearched is

not enough, by itself, to permit a reasonable officer to characterize a suspect as an immediate

threat.  *Cooper*, 844 F.3d at 522–23 n.2 (officer could see plaintiff's hands and knew he had no

weapon).    Furthermore, while "[o]fficers may consider a suspect's refusal to comply with

instructions . . . in assessing whether physical force is needed to effectuate the suspect's

compliance . . .[they] must assess not only the need for force, but also the relationship between

the need and the amount of force used."    *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017)

(citations omitted).    Therefore, where an individual's conduct amounts to no more than "passive

resistance," the use of force is not justified.    *Id*. (citation omitted).    For example, pulling an arm

away from an officer's grasp constitutes no more than passive resistance.    *See Trammell*, 868

F.3d at 341-342; *see also Boyd*, 74 F.4th at 668 (inmate's act of jerking his hand away from a

guard and yelling in pain does not constitute the kind of threatening behavior or belligerence that

justifies the use of force).    Moreover, "even where force is authorized, officers must employ an

appropriate *degree* of force to stay within constitutional bounds."    *Sligh*, 87 F.4th at 299.    An

"officer must use force with measured and ascending actions that correspond[ ] to [a suspect's]

escalating verbal and physical resistance."    *Id*. (quoting *Joseph*, 981 F.3d at 332–33) (internal

quotation marks omitted).    "If the suspect lacks any means of evading custody—for example, by

being pinned to the ground by multiple police officers—force is not justified."    *Joseph*, 981 F.3d

at 335.    As a result, the Fifth Circuit has recognized the viability of a Fourth Amendment claim

when an officer eschews less coercive measures, and, instead, immediately escalates to the use of

physical force, under circumstances where the detainee/arrestee is not accused of a serious crime,

the officer does not have reason to believe that the detainee/arrestee poses an immediate threat to

officers or the public, and/or he engages in no more than passive resistance.    *See, e.g., Boyd*, 74

F.4th at 666 (plaintiff was nonthreatening, not a security risk, and not resisting); *Ramirez v.*

*Martinez*, 716 F.3d 369, 378–79 (5th Cir. 2013) (not a serious crime, not an immediate threat,

and did no more than pull arm away); *Trammell*, 868 F.3d at 342-343 (minor offense, no

indication of flight, and only pulled arm away); *Cooper*, 844 F.3d at 522-523 (serious, but non-

violent offense, no immediate threat to officer or others, and only passive resistance); *Sligh*, 87

F.4th at 299 (use of dog bite on woman who was not suspected of any crime, did not pose

immediate safety threat to others, and not attempting to flee).

The foregoing calculation changes, however, when, as here, the arrestee leads officers on

a high-speed chase, thereby providing the officers with reasonable cause to question the sincerity

of the arrestee's post-chase surrender attempts.    *Salazar* proves particularly instructive in this

regard.    *Salazar*, 37 F.4th at 281-284.    Like the instant case, Salazar led officers on a high-speed

car chase before:   stopping, exiting the car, dropping to his knees, raising his hands, and then

lying down on the ground with his arms above his head and his legs crossed.    *Id*.   In short,

within five seconds after stopping his car, Salazar was lying prone on the ground, which lasted

up until two seconds before a deputy ran up to him when he uncrossed his legs.    *Id*.   As soon as

the deputy reached Salazar, he applied two five-second cycles of his taser.    *Id*.   In finding that

the officer's conduct did not amount to a Fourth Amendment violation, the Fifth Circuit summed

up, as follows,

> [w]hen Molina made the split-second decision to deploy his taser, Salazar had just
> committed a dangerous felony and was unrestrained at night in the open.   Because
> of the preceding high-speed chase, Molina could reasonably be concerned about
> the sincerity of Salazar's purported surrender.   And the totality of the force
> deployed—a 10-second tasing—was comparatively modest and not grossly
> disproportionate to the threat Molina could have reasonably perceived. We hold
> that Molina's conduct did not amount to an unreasonable seizure under the Fourth
> Amendment.

*Salazar,* 37 F.4th at 284.

Similarly, in *Escobar*, a dog bite case, the plaintiff had dropped the knife he was holding

20

and lay flat on the ground "like a parachute man," just before being bitten by the dog.   *Escobar*, 895 F.3d at 394-395.   Escobar did not struggle and begged for the dog to be removed during the attack, which lasted about one minute.   *Id*.   Escobar argued, and the district court agreed, that a reasonable jury could find that the officer allowed the dog to bite him after it was apparent that Escobar was no longer armed and not resisting arrest.   *Id*.   The Fifth Circuit, however, viewed the facts differently, finding, instead, that a reasonable officer could believe that Escobar's "surrender" was a ploy because:

> [t]he chase was at night; Escobar had hidden from the police for twenty minutes in a neighbor's backyard; the chase, along with the warnings from Escobar's mother, would lead a reasonable officer to believe that, as he had apparently promised, Escobar would not go without a fight; and the knife remained within Escobar's reach, ready to be used.

*Id*.

The *Escobar* panel distinguished the Court's earlier decision in *Cooper v. Brown*, where it "had held that officers used excessive force by permitting a dog to continue biting a suspect when they had no reason to think he had a weapon, his hands were visible, and he complied with officers' commands."   *Escobar*, 895 F.3d at 394 (citing *Cooper*, 844 F.3d at 522−23).   In so doing, the Court stressed that the officer still had reason to believe Escobar posed a threat because he had a knife within reach and Escobar's own mother had told officers that he would have to be killed.   *Id*.

Applying the foregoing authority to the present facts, the undersigned finds that, despite Mouncil's attempt to surrender in a well-lighted area, in the presence of multiple officers, and apparently in compliance with their initial commands, an officer, nonetheless, reasonably could believe that the surrender was insincere, not only because of the preceding high-speed car chase,

but also because of the rapidity with which Mouncil alighted from the truck without awaiting a command to exit the vehicle. *See Salazar*, 37 F.4[th] at 284 (finding reasonable basis for fear of flight or threat to others where Salazar exited the car without awaiting a command to do so). In addition, the officers' knowledge that Mouncil was transporting illegal narcotics provided reasonable grounds for them to fear that he might be carrying a concealed weapon.

Accordingly, even without introducing Mouncil's arm movements to the mix, all three of the *Graham* factors support a finding that Dunn's use of the K-9 in this case did not constitute excessive force: Mouncil was wanted for a serious crime, i.e., flight via high-speed car chase; the same high-speed car chase provided reasonable basis to question the sincerity of Mouncil's attempted surrender; Mouncil's active participation in the drug trade provided reasonable basis to suspect that he was armed; and the fact that he fled from officers initially, but then exited the car without awaiting a command to do so, provided reasonable grounds to fear that he intended to continue evading arrest.

Mouncil's initial hand/arm movement out of Chapman's grasp provided additional grounds for an officer to reasonably suspect that he posed a continued and immediate threat to their safety or risk of flight. Accordingly, the Court finds that Dunn's initial, six-second deployment of Samos was objectively reasonable.

Dunn's follow-up, 45-second deployment of Samos presents a closer question. Nonetheless, even construing the video evidence in favor of Mouncil, he can be seen moving his arm out of Chapman's grasp as Samos approached him. Consequently, an officer reasonably could have construed this movement as additional passive resistance by a suspect who had led them on a high-speed chase and who still might be possessing a weapon. Furthermore, with the

22

exception of the first eleven seconds of the bite and the twelve seconds after the pat down, the

remainder of the time that Samos was engaged (i.e., clamped down on Dunn's arm) occurred

either during the pat down itself or after Dunn had started to coax Samos into releasing his grip.

While it is plain from the video that even twenty-three seconds of arguably gratuitous application

of K-9 force represented an eternity of agony for Mouncil, the Court is only able to make this

determination after playing, rewinding, and replaying the video to isolate these periods.

However, such frame-by-frame analysis of officers' split-section decisions made in the

heat of the moment is precisely the "sort of Monday morning quarterbacking" that the Fifth

Circuit cautions district courts against.   *McVae v. Perez*, 120 F.4th 487, 493 (5th Cir. 2024)

(citation omitted).   Ultimately, Dunn began trying to disengage Samos thirty-four seconds after

he commenced the second bite, and, to his credit, succeeded in removing Samos *before* Mouncil

was handcuffed.   *See Benfer*, 120 F.4th at 1284 (highlighting the officer's attempt to release the

K-9 before he had finished handcuffing the suspect).   Under the totality of the circumstances,

the Court is constrained to find that Dunn's use of the K-9 for both the initial six-second and the

subsequent forty-five second applications of force was objectively reasonable.[8]   *Id.*

The Court's having determined that there was no Fourth Amendment violation associated

with Mouncil's excessive force claim, it necessarily follows that such a right was not clearly

established.   *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079 n.7 (5th Cir. 1995); *Mace*

---

[8]  That is not to say that the Court condones the actions of the officers in this case.   Indeed, the
videos of the encounter are quite disturbing.   Furthermore, from the officers' statements on the
video, there is evidence that they may have intended to extract a pound of flesh from Mouncil
because he had the temerity to flee from them.   Finally, it is unprofessional to say the least for
officers and paramedics to joke about Bland's injuries.   Nevertheless, it is clear that the Fourth
Amendment inquiry is an objective one, and, so long as an officer reasonably could have
perceived a continued threat, a violation cannot be based on the officer's retributive motivation.

*v. City of Palestine*, 333 F.3d 621, 623–24 (5th Cir. 2003) ("If there is no constitutional violation, [the Court's] inquiry ends").    However, for the sake of completeness, the undersigned briefly will address the second prong of the qualified immunity analysis.

"Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Salazar*, 37 F.4th at 285 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104-105 (2018)).    Except in an "obvious" case (which this one is not),[9] "to show a violation of clearly established law, [plaintiff] must identify a case that put [defendant] on notice that his specific conduct was unlawful." *Id*. (citation omitted).    As the Fifth Circuit phrased it, "the law must be *so* clearly established that—in the blink of an eye, in the middle of a high-speed chase—every reasonable officer would know it immediately." *Id*. (quoting *Morrow v. Meachum,* 917 F.3d 870, 876 (5th Cir. 2019)).

In his brief, Mouncil cited seven cases that potentially could be used to establish clearly established law.    Two of the cases,[10] however, found no constitutional violation, so they are of no help. *Salazar*, 37 F.4th at 286 (citation omitted).    In the 2023 *Sligh v. City of Conroe, Texas* decision cited by Mouncil, the Court found a constitutional violation associated with a dog bite that occurred in 2018, but then held that it did not violate clearly established law. *Sligh*, 87 F.4th at 301.    In so doing, the Fifth Circuit distinguished its 2016 decision in *Cooper v. Brown*,

---

[9] "The standard for obviousness is sky high . . ." *Joseph*, 981 F.3d at 337.    In *Sligh*, a dog bite case, where at least one of the *Graham* factors weighed in favor of the officer, the Court held that the constitutional violation was not an obvious one. *Sligh*, 87 F.4th at 300.

[10] *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012); *Windham v. Harris Cnty., Texas*, 875 F.3d 229, 243 (5th Cir. 2017).

because, in part, the officer in *Cooper* let the dog bite the plaintiff for one to two minutes and did not order the dog to release until after the suspected had been handcuffed.  *Id*.  Moreover, in *Cooper*, no reasonable officer could have concluded that Cooper posed an immediate threat to anyone, he was not suspected of committing a violent offense, and the officer knew he had no weapon.  *Cooper*, 844 F.3d at 522-523.  Even the officer's own expert "testified that there was no evidence that would have led a reasonable officer to believe that Cooper was a threat."  *Id*.  Accordingly, *Sligh* and *Cooper* do not provide Dunn with notice that his specific conduct was unlawful.

Mouncil also cited *Trammell v. Fruge*, *Joseph v. Bartlett*, and *Deville v. Marcantel*.  In *Trammell*, however, plaintiff was suspected of committing only a misdemeanor, a question of fact remained whether he posed a danger to anyone, and no reasonable officer would have believed that he intended to flee the scene.  *Trammell*, 868 F.3d at 340-341.  Meanwhile, in *Joseph*, the suspect had not committed any crime and presented no immediate threat to anyone.  *Joseph*, 981 F.3d at 333-334.[11]  Finally, in *Deville*, the plaintiff was stopped for a minor traffic infraction, and there was no reason to believe that her actions posed a threat to anyone.  *Deville v. Marcantel*, 567 F.3d 156, 167-168 (5th Cir. 2009).  Also, both parties' experts agreed that, under the circumstances, further negotiation was the more appropriate course of action rather than resorting to actual force.  *Id*.

In sum, Mouncil has failed to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment."  *Joseph*, 981 F.3d at 338 (citation omitted).  Consequently, he has not met his burden to show that Dunn violated clearly

---

[11]  Moreover, *Joseph*, decided in 2020, post-dates the event at issue here.

established law.[12]   Dunn is entitled to qualified immunity.   *Salazar*, 37 F.4th at 288.

### III.    Bystander Liability/Failure to Intervene Claim against Chapman

The Fifth Circuit has recognized that an officer may be liable under § 1983 pursuant to a theory of bystander liability where the officer:   "(1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph,* 981 F.3d at 343 (citing *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013)).

However, the Court's having found no constitutional violation on the part of Deputy Dunn, there was no reason for Deputy Chapman to intervene, and he cannot be held liable for failing to do so.   *Woodard v. Carol*, 630 F.Supp.3d 806, 818–20 (W.D. La. 2022) (citation omitted).   In any event, Mouncil did not identify case law establishing that Chapman violated his constitutional rights, such that "any reasonable officer would have known that the Constitution required [him] to intervene."   *See Sligh*, 87 F.4th at 301 (citation omitted). Accordingly, Chapman, too, is entitled to qualified immunity.   *Id*.

### IV.    Putative State Law Claims and Additional Parties

As stated previously, it appears that Mouncil endeavored to set forth various state law theories of recovery against, not only Dunn and Chapman, but also additional non-parties.   *See* Statement [doc. # 48].   Plaintiffs, especially unrepresented plaintiffs, need not plead theories of

---

[12]  If an officer has to recall and analyze a plethora of Fifth Circuit cases to determine how to proceed, then it is plain that the law is not so clearly established "that—in the blink of an eye, in the middle of a high-speed chase—every reasonable officer would know it immediately." *Salazar,* 37 F.4th at 288 (citation omitted).

recovery.   Furthermore, it is manifest that a complaint need not cite a specific statutory provision or articulate a perfect "statement of the legal theory supporting the claim asserted."   *Smith v. Bank of Am., N.A.*, 615 Fed. App'x. 830, 833 (5th Cir. 2015) (citing *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 135 S.Ct. 346, 347 (2014)).   Therefore, Mouncil's existing complaint, as amended, suffices to include state law theories of recovery against Dunn and Chapman.   However, the Statement was not effective for the purpose of joining additional parties.   Rather, leave of court was required to amend, and the time to do so, in this over four-year-old case, passed long ago.

Nevertheless, when, as recommended here, all claims which conferred federal subject matter jurisdiction are dismissed, the court may decline to exercise supplemental jurisdiction over the remaining state law claims.   28 U.S.C. § 1367(c)(3).   In fact, this is the general rule. *Priester v. Lowndes County*, 354 F.3d 414, 425 (5th Cir. 2004) (citation omitted).   The twin interests of comity and efficiency dictate that any remaining state law claims be dismissed without prejudice.   28 U.S.C. § 1367(c).[13]  Accordingly, it is recommended that the Court decline to exercise supplemental jurisdiction over Mouncil's state law claims against the existing and putative parties.

## Conclusion

Based on the evidence of record, no reasonable trier of fact could return a verdict in favor of Mouncil finding that Defendants Dunn and Chapman violated his constitutional rights. Consequently, Dunn and Chapman are entitled to summary judgment, dismissing Mouncil's §

---

[13]   The limitations period is tolled for a minimum of 30 days after dismissal.   *See* 28 U.S.C. § 1367(d).

1983 claims against them.    For the above-assigned reasons,

IT IS RECOMMENDED that the motion for summary judgment [doc. # 53] filed by Defendants, Justin Dunn and Ryan Chapman, be GRANTED and that Plaintiff Bland Mouncil's claims against said Defendants under 42 U.S.C. § 1983 be DISMISSED WITH PREJUDICE. FED. R. CIV. P. 56.

IT IS FURTHER RECOMMENDED that any state law claims attempted to be asserted herein by Plaintiff Bland Mouncil be DISMISSED WITHOUT PREJUDICE.    28 U.S.C. § 1367.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.C.P. Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.    A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.    A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.    Timely objections will be considered by the District Judge before she makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

28

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 5th day of February, 2025.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

29